**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DEBRA ROSE ARELLANO,

     Plaintiff,

     vs.                                   Civ. No. 18-600 KK

ANDREW SAUL, Commissioner
of the Social Security Administration,

     Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Debra Rose Arellano's ("Ms. Arellano") Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 23) ("Motion"), filed February 15, 2019, seeking review of the unfavorable decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), on Ms. Arellano's claim for Title II disability insurance benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner filed a response in opposition to the Motion on April 15, 2019, (Doc. 29), and Ms. Arellano filed a reply in support of the Motion on May 1, 2019. (Doc. 32.) Having meticulously reviewed the entire record and the applicable law and being otherwise fully advised in the premises, the Court FINDS that Ms. Arellano's Motion is well taken and should be GRANTED IN PART.

## I.    Background

### A.    Procedural History

On May 6, 2016, Ms. Arellano filed an application with the Social Security Administration ("SSA") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 9.)

(Administrative Record ("AR") 266.) She alleged a disability onset date of March 24, 2016 and that she was suffering from post-traumatic stress disorder ("PTSD"), depression, anxiety, insomnia, fibromyalgia, back pain, muscle spasms, panic attacks, memory loss, a bulging disc, and broken knees. (AR 169-70, 266.) Disability Determination Services ("DDS") determined that Ms. Arellano was not disabled both initially (AR 169-80) and on reconsideration. (AR 183-98.) Ms. Arellano requested a hearing with an Administrative Law Judge ("ALJ") on the merits of her application. (AR 210-11.)

ALJ Michael Leppala held a hearing on September 7, 2017. (AR 115-67.) Ms. Arellano and Vocational Expert (VE) Leslie White testified. (Id.) ALJ Leppala issued an unfavorable decision on January 24, 2018. (AR 026-044.) Ms. Arellano submitted a Request for Review of Hearing Decision/Order to the Appeals Council (AR 263-65), which the Appeals Council denied on May 4, 2018. (AR 001-4.) Consequently, the ALJ's decision became the final decision of the Commissioner from which Ms. Arellano appeals. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

**B.    Ms. Arellano's Background, Medical Treatment, and Hearing Testimony**

Ms. Arellano is a high school graduate who held various data entry positions until she stopped working in March 2016 at age forty-two. (AR 266, 287, 288.) She traces her physical impairments to a 2007 incident in which she suffered two broken knees and a broken right wrist when her then-husband, whom she divorced in January 2010, hit her "head on" with his Harley Davidson motorcycle while she was standing on the road. (AR 136, 267, 434.) She spent one week in the hospital receiving treatment for her injuries. (AR 434.) In November 2012, she began seeking treatment for back pain and difficulty sleeping. (AR 434-36.) She established care with Dr. James Delgado at Christus St. Vincent Medical Group on January 2, 2013 to address back,

neck, wrist, and knee pain (AR 363-65) and continued to see Dr. Delgado for pain management through at least January 2017.[2] (See AR 351-420, 498-513, 558-619, 796-99, 804-809.) Dr. Delgado began treating Ms. Arellano's low back pain with narcotic pain medication on January 15, 2013. (AR 360.) In his treatment notes from January 29, 2013, Dr. Delgado commented, "I think we may be underestimating the role of the intentional injury related to her ex and the contribution this may have with her ongoing pain." (AR 358.) Dr. Delgado initially explored alternative treatment options such as physical therapy and injections with Ms. Arellano but noted in March 2013, "It seems clear there are no other options [Ms. Arellano] is willing to consider but narcotic pain medication." (AR 355.) When Ms. Arellano complained of worsening back pain in August 2013 and reported that she was "having to take more pain medication to get the same relief[,]" Dr. Delgado again discussed other treatment options with her and indicated that she would need to be sent for a neurosurgical evaluation if her symptoms did not improve. (AR 378-79.) At that time, though, he continued her on hydrocodone and prescribed a muscle relaxant to address her complaints of muscle spasms. (Id.) Thereafter, Dr. Delgado continued to treat Ms. Arellano's low back pain, lumbar disc degeneration, and knee pain with narcotic pain medications and muscle relaxants. (AR 367, 371, 373, 375, 377.)

At a visit with Dr. Delgado in June 2014, Ms. Arellano reported that she was "feeling very down after recently recognizing a history of childhood sexual abuse" she reportedly suffered from age six to age twelve. (AR 400, 553.) She inquired about the possibility of "medical therapy" to address her feelings of depression, and Dr. Delgado prescribed her paroxetine to treat what he diagnosed as PTSD and encouraged her to seek counseling. (AR 401.)

---

[2] The administrative record contains no treatment records from Dr. Delgado after January 2017. However, in her "Recent Medical Treatment" form submitted to DDS on August 7, 2017, Ms. Arellano indicated that she had been treated by Dr. Delgado in February, March, and April 2017. (AR 343.)

In July 2014, Ms. Arellano reported increased pain in her left knee and asked about adjusting her pain medication. (AR 397.) Dr. Delgado agreed to a one-month trial at a higher dose of hydrocodone. (AR 398.) He continued her at the higher dose of hydrocodone, in addition to continuing to prescribe a muscle relaxant and paroxetine, through November 2015, at which time informed Ms. Arellano that he would no longer prescribe her narcotic pain medications due to a positive drug test for cocaine. (AR 382, 384, 387, 389, 392, 395, 397-98, 403, 406, 409, 415, 419, 511-13.) In December 2015 and January 2016, Ms. Arellano attempted to establish her primary care with five other doctors for chronic pain management, all of whom refused to prescribe narcotics and two of whom prescribed tramadol, a narcotic-like pain reliever. (AR 427-28, 429-31, 441-43, 443-49, 507-10.) She returned to Dr. Delgado in February 2016 at which time Dr. Delgado had a "lengthy discussion" with her "regarding reconsideration of narcotic pain medication prescriptions." (AR 504.) The urine test she was given that day came back negative for cocaine, and Dr. Delgado agreed to consider restarting narcotic pain medications once he reviewed Ms. Arellano's prescription monitoring report. (AR 504-505.) In April 2016 after confirming there were "no discrepancies" in that report, he provided a one-month refill of oxycodone at her original, lower dose and noted he would continue "careful monitoring" of any illicit drug use. (AR 500-501.) He also started her on Cymbalta at that time to treat both her PTSD and her chronic pain. (AR 501.)

On May 28, 2016, Ms. Arellano was hospitalized following what her family believed was a credible suicide threat. (AR 519.) Hospital records indicate that Ms. Arellano had a blood alcohol level of 150 and tested positive for cocaine, opiates, and cannabis. (Id.) According to Ms. Arellano, she threatened to harm herself because she "just wanted to scare her husband[,]" who was also heavily intoxicated and with whom she had gotten into a fight. (Id.) She admitted having a history

of drinking that started during her first marriage but contended that she stopped abusing alcohol in 2012 and only drank occasionally thereafter. (AR 520.) She was admitted for a 3-5-day voluntary stay for "observation and treatment of depression." (AR 522.) Upon discharge, Ms. Arellano's Cymbalta was adjusted based on reported side effects, she was started on prazosin to address reported nightmares, and she was scheduled for follow-up care with psychologist Dr. Robert Rinaldi, Ph.D. (AR 523-24.)

Ms. Arellano began seeing Dr. Rinaldi on June 2, 2016. (AR 553-55.) She told Dr. Rinaldi that she had been abstinent from alcohol for eighteen months but had started drinking again after feeling very depressed which led to the incident that precipitated her hospitalization. (AR 553.) Ms. Arellano reported that she was planning to reinitiate therapeutic counseling with the therapist she had been treating with the year before. (AR 553, 629.) Dr. Rinaldi conducted a psychiatric diagnostic assessment and diagnosed Ms. Arellano with PTSD. (AR 554.) He indicated that he would continue to coordinate with Dr. Delgado to address Ms. Arellano's medication needs. (AR 555.) Also in June 2016, Ms. Arellano briefly reestablished with Andrea Serna, LPCC, at Hoy Recovery, the counselor she had seen in 2015.[3] (AR 621-29.) At that time, LPCC Serna diagnosed Ms. Arellano with PTSD and alcohol dependence and set goals for her to, *inter alia*, "[r]educe the significant impairment caused by PTSD" and help her "[r]eprocess trauma/abuse and resume adaptive functioning at home/school/work." (AR 629, 632-33.)

For the remainder of 2016 and into early 2017, Dr. Delgado continued treating Ms. Arellano's complaints of pain with narcotic pain medications and a muscle relaxant. (AR 658, 660, 663, 667, 669, 673, 797, 805, 808.) In August 2016, he agreed to increase her dose of oxycodone.

---

[3] LPCC Serna's treatment notes from June 7, 2016 indicate that Ms. Arellano was "return[ing] to therapy after approximately a year" and had "stopped therapy" around the time she was thinking about confronting her abusers. (AR 629.) The administrative record, however, contains no records from LPCC Serna from 2015, only he treatment records documenting three encounters she had with Ms. Arellano in June and July 2016. (AR 621-41.)

(AR 659-60.) He and Dr. Rinaldi continued to coordinate treatment of her PTSD, prescribing and adjusting the doses of different antidepressants and even discussing the possibility of using medical cannabis to treat her PTSD symptoms. (AR 658, 661, 664, 667, 801, 802, 805, 808, 810-11.)

After Ms. Arellano was late to an appointment and repeatedly used profanity with Dr. Delgado's staff, Dr. Delgado noted in his January 20, 2017 treatment note that he "may have to dismiss her as a patient based on this recurrent behavior." (AR 796-97.) The administrative record contains no treatment records from Dr. Delgado after that date, but Ms. Arellano indicated in her "Recent Medical Treatment" form submitted to DDS on August 7, 2017 that she saw Dr. Delgado in February, March, and April 2017. (AR 343.)

Ms. Arellano began seeing psychiatrist Stephanie Tucker, MD, on August 9, 2017. (AR 842.) After seeing Ms. Arellano twice, Dr. Tucker completed a Mental Residual Functional Capacity (MRFC) Questionnaire on August 22, 2017 in which she indicated her diagnoses of PTSD and depression and that she had started Ms. Arellano on a "new regimen of medications" to address those conditions. (AR 842, 846.) Based on her examination of Ms. Arellano, Dr. Tucker opined in the Questionnaire that Ms. Arellano was "unable to meet competitive standards" in three of the twenty-five areas of functioning assessed: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms, (2) perform at a consistent pace, and (3) deal with normal work stress. (AR 844-45.) Dr. Tucker believed Ms. Arellano to be "seriously limited, but not precluded" in fifteen other areas of functioning and "limited but satisfactory" in the remaining seven areas. (Id.) In response to the question, "If your patient's impairments include alcohol or substance abuse, do alcohol or substance abuse contribute to any of your patient's limitations set forth above?" Dr. Tucker placed a checkmark next to, "No." (AR 846.)

At her hearing on September 7, 2017, Ms. Arellano testified that she "quit seeing the doctor that I've been seeing for about seven years"—presumably referring to Dr. Delgado—because "I just felt that my health issues and everything else, they just weren't giving me the full treatment I needed." (AR 132-33.) She further testified that she was "starting to get back on all [her] medications" as of the month before. (AR 133.) She also informed the ALJ that she was scheduled to see a neurologist the next day and referred to Dr. Tucker as "the new doctor I'm seeing now." (AR 133, 149.) Regarding her physical limitations, Ms. Arellano testified that she can walk for approximately ten minutes, stand for about five minutes, and sit for about twenty minutes at a time. (AR 136.) She uses a cane and usually wears braces on her knees. (AR 136-37.) She has chronic, sharp pain in her back and experiences pain levels of 9 out of 10 in her back and knees on a daily basis. (AR 138-39.) She tore her left rotator cuff in May 2016 and described herself as "still actually healing from" that injury. (AR 140.) Regarding her mental conditions, Ms. Arellano testified that her PTSD and anxiety are what caused her to stop working because she "was just unable to get to work" and "couldn't function at work." (AR 131.) She described herself as having "a lot of depression" that prevents her from working because she "just break[s] out crying a lot[,]" as much as six or eight hours a day. (AR 131-32.) She also described experiencing "flashbacks" and "severe nightmares" that result in her being unable to sleep more than two hours at night. (AR 134.) Regarding her daily activities, Ms. Arellano testified that she does not read, does not pay attention to the television even though it is always on, cannot dress herself or comb her hair without assistance from her husband or mother, no longer drives, and does not go grocery shopping. (AR 134, 141-42.) Regarding personal relationships, Mrs. Arellano explained that while she has friends, she does not associate with them and that the only people she talks to on the phone are her mother and daughter, whom she also sees once or twice a week. (AR 143-44.)

## C.	The ALJ's Decision

Although the ALJ found that Ms. Arellano has severe osteoarthritis, chronic knee pain, fibromyalgia, obesity, PTSD, anxiety, affective disorder, and polysubstance abuse, he found that the record did not support finding any of the foregoing impairments presumptively disabling. (AR 031-32.) He, therefore, proceeded to assess her residual functional capacity ("RFC") to determine whether she could either return to her past relevant work or make an adjustment to other work. (AR 033-39.) *See* 20 C.F.R. § 404.1520(a)(4) (setting forth the five-step sequential evaluation process the SSA follows in evaluating DIB claims); *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). The ALJ found that Ms. Arellano has the RFC to perform light work with certain exertional and nonexertional limitations. (AR 033.) Specifically, he found that Ms. Arellano

> is capable of occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying ten pounds, standing and/or walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday, all with normal breaks. She is further limited to occasionally climbing ramps, stairs, ladders, ropes, or scaffolds, frequently stooping, occasionally kneeling, frequently crouching, and occasionally crawling. [Ms. Arellano] can understand, carry out, and remember simple instructions and make commensurate work-related decisions, respond appropriately to supervision, coworkers, and work situations, deal with routine changes in work setting, maintain concentration[,] persistence, and pace for up to and including two hours at a time with normal breaks throughout a normal workday. [Ms. Arellano] is limited to simple, routine, and repetitive tasks and is suitable for jobs involving work primarily with things and not people.

(AR 033.)

In discussing how he arrived at Ms. Arellano's RFC, the ALJ explained that he found that Ms. Arellano's "subjective complaints are out of proportion to and not supported by the objective medical evidence." (AR 037.) Specifically, he found

> [Ms. Arellano's] range of motion has been normal. I note that [Ms. Arellano] has an extensive history of polysubstance abuse. Moreover, she has not sought treatment for any impairment since January 2017. [Ms. Arellano] has previously reported that she prepares meals, does light housekeeping, does laundry, and does dishes. She indicated that she drives and shops in stores. She stated that she enjoyed

watching television and socializing with her family. These activities of daily living are inconsistent with complaints of disabling pain.[4]

(AR 036 (citations omitted).) Later in his analysis, the ALJ additionally found

[Ms. Arellano] has reported that she has no limitations in her activities of daily living and is capable of maintaining her household. She has indicated that she manages her finances and drives. She asserted that she has no difficulty making or keeping friends. She stated that she enjoys reading, is active and energetic, and likes games.[5]

(AR 037 (citations omitted).)

Regarding the medical opinions of record, the ALJ accorded "significant weight" to the opinions of the two non-examining state agency physicians who limited Ms. Arellano to "a less than light" physical RFC based on his finding that their opinions were "generally consistent with longitudinal medical records and [Ms. Arellano's] activities of daily living." (AR 036.) He accorded "some weight" to the opinions of the two non-examining state agency psychological consultants, who opined that Ms. Arellano's mental impairments were "non-severe." (AR 036-37.) He also accorded "some weight" to the opinion of Dr. Michael Gzaskow, a consultative examining psychiatrist whose November 2016 report to DDS provided:

1. [Ms. Arellano] can relate to others, but this is often compromised by her PTSD issues, depressive isolation and episodic anxiety.
2. She can understand directions in a structured/supportive environment but indicates she can no longer follow through in a productive manner due to her physical and psychological problems[.]
3. She can attend to simple tasks.

(AR 036, 789-93.) Regarding Dr. Tucker's opinion that Ms. Arellano was "seriously limited" in numerous areas of functioning and "unable to meet competitive standards" in others (see AR 842-

[4] In support of his findings regarding Ms. Arellano's activities of daily living, the ALJ cited the Function Report Ms. Arellano completed on June 1, 2016. (AR 036, 294-301.)

[5] In support of these findings, the ALJ again cited Ms. Arellano's June 2016 Function Report and also cited LPCC Serna's description of Ms. Arellano's strengths in the I/OP Biopsychosocial Assessment she completed on June 7, 2016. (AR 037, 294-301, 622, 628.)

46), the ALJ began by finding that Dr. Tucker "examined [Ms. Arellano] on a total of three occasions" and "noted that [Ms. Arellano's] condition may improve with treatment."[6] (AR 037.) He then found that Dr. Tucker's opinion "fails to disclose [Ms. Arellano's] extensive history of illegal drug use and alcohol use" and proceeded to assign her opinion "little weight" because he found it to be "unsupported by the record and the Claimant's activities of daily living" described above. (Id.)

Although he found her unable to perform her past relevant work, the ALJ determined at step five of the sequential evaluation process, and based on the testimony of VE White, that Ms. Arellano was not disabled based on his conclusion that given her education, work experience, and RFC, she is capable of making a successful adjustment to working as either an advertising material distributor or a housekeeper. (AR 038-39, 156-58.)

**D.     The Appeals Council's Refusal to Consider Additional Evidence**

When Ms. Arellano sought review of the ALJ's decision by the Appeals Council, she submitted additional evidence for the Appeals Council's consideration. The Appeals Council separated the additional evidence into two categories—(1) records dated before the ALJ's January 2018 decision, and (2) records dated after the ALJ's decision—and gave different reasons as to why it refused to consider each category of evidence. As to the first category, the Appeals Council found that the evidence predating the ALJ's decision "does not show a reasonable probability that it would change the outcome of the decision." (AR 002.) As to the second, the Appeals Council found that the evidence postdating the ALJ's decision "does not relate to the period at issue." (Id.) The Appeals Council denied Ms. Arellano's request for review. (AR 001.)

## II.     <u>Discussion</u>

---

[6] The Court notes that Dr. Tucker's August 2017 MRFC Questionnaire indicated a prognosis of "fair, <u>may</u> improve w/treatment[.]" (AR 842 (emphasis in original).)

Ms. Arellano argues that the ALJ's finding that Ms. Arellano is not disabled constitutes error because the ALJ's RFC assessment on which that finding is based is unsupported by substantial evidence. (Doc. 23 at 1.) Ms. Arellano contends that the ALJ failed to properly weigh the evidence regarding her functional limitations and that his RFC assessment is contrary to the substantial evidence of record, specifically the opinions of Ms. Arellano's "treating and examining mental health provider[.]" (Id.) She complains that the ALJ "rejected" those opinions without providing legally sufficient explanations supporting his rejection, thereby necessitating remand. (Doc. 23 at 1, 5-15.)

Ms. Arellano also argues that the Appeals Council erred by refusing to admit and consider the additional evidence she submitted. (Doc. 23 at 20-25.) Because the Court finds that the Appeals Council erred in this regard, the matter is remanded for further proceedings. *See Chambers v. Barnhart*, 389 F.3d 1139, 1142-43 (10th Cir. 2004) (explaining that if additional, qualifying evidence has been submitted to the Appeals Council and the Appeals Council refuses to consider it, "the case should be remanded for further proceedings" because the Appeals Council must "determine in the first instance whether, following submission of additional, qualifying evidence, the ALJ's decision is contrary to the weight of the evidence currently of record" (quotation marks omitted)).

## A.     Applicable Law

The Social Security Regulations set forth five reasons why the Appeals Council will review a case that has been decided by an ALJ. 20 C.F.R. § 404.970(a). One is if the Appeals Council "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and if there is a reasonable probability that the additional evidence would

change the outcome of the decision." *Id.* § 404.970(a)(5).[7] To invoke the right to review by the Appeals Council based on the submission of additional evidence, the claimant must also "show good cause for not informing [the SSA] about or submitting the [additional] evidence" for the ALJ's consideration. *Id.* § 404.970(b).[8] Whether evidence qualifies for consideration by the Appeals Council is a question of law subject to de novo review. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003). The Court considers in turn each of the Appeals Council's proffered reasons for refusing to consider Ms. Arellano's additional evidence.

**B. The Appeals Council erred by refusing to consider the additional evidence Ms. Arellano submitted that predates the ALJ's decision.**

Ms. Arellano submitted for the Appeals Council's consideration two sets of medical records covering the period prior to January 24, 2018, i.e., the date the ALJ issued his written decision. (AR 082-96, 097-114.) The additional evidence predating the ALJ's decision comprised:

1. Dr. Tucker's medical treatment records dated 08/09/2017 to 01/02/2018 (AR 097-114); and
2. Medical treatment records from Injury Relief Center dated 12/06/2017 to 01/09/2018 (AR 082-96).

As noted above, the Appeals Council refused to consider these records because it found that there was not a reasonable probability that they would change the outcome of the decision. (AR 002.) The Court disagrees.

**1. There is a reasonable probability that the additional evidence provided in Dr. Tucker's treatment records would change Ms. Arellano's nonexertional RFC and, therefore, the decision.**

---

[7] 20 C.F.R. § 404.970 was amended effective January 17, 2017, with compliance with the amended version required by May 1, 2017. 81 Fed. Reg. 90,987 (Dec. 16, 2016). Because the ALJ's decision in this case was issued on January 24, 2018 and the Appeals Council's consideration of Ms. Arellano's Request for Review necessarily occurred thereafter, the amended regulation applies.

[8] The record and the parties' arguments on appeal make no reference to the new "good cause" requirement that was added to the regulation via the 2017 amendment. The Court, therefore, limits its analysis to the Appeals Council's stated reasons in its Notice of Appeals Council Action regarding why it declined to consider Ms. Arellano's additional evidence. (AR 002.)

The additional records from Dr. Tucker included treatment notes from her sessions with Ms. Arellano on August 9, August 17, September 14, and October 12, 2017, and January 2, 2018. (AR 097-114.) In the treatment notes from her initial visit with Ms. Arellano on August 9, 2017, Dr. Tucker documented Ms. Arellano's past psychiatric history (including prior therapy and medications), substance abuse history (including prior cocaine use and heavy drinking), and social and family history (including being molested as a child and physically abused by her ex-husband). (AR 097-99.) She diagnosed Ms. Arellano with chronic PTSD, started her on various medications, and referred her to Linda Hill, Psy.D., for "trauma therapy." (AR 100.) Dr. Tucker's notes from a follow-up visit on August 17, 2017 indicate that Ms. Arellano reported that she was "still having [nightmares] and flashbacks[] and is not sleeping." (AR 103.) Dr. Tucker adjusted Ms. Arellano's medications accordingly. (Id.) On September 14, 2017, Ms. Arellano reported that her anxiety and depression had not gotten better, that she was still not sleeping and continued to have nightmares and flashbacks, and that she was experiencing crying spells. (AR 106.) Dr. Tucker observed on that date that Ms. Arellano was "tearful on interview." (Id.) She added a new medication to Ms. Arellano's regimen to address her sleep, appetite, and depression symptoms. (AR 107.) At her October 2017 follow up, Ms. Arellano reported that she was still depressed, her anxiety was "about the same, maybe worse," and that she had been "crying a lot." (AR 109.) Dr. Tucker increased one of Ms. Arellano's medications to address her depression, anxiety, and PTSD symptoms. (Id.) In January 2018, Ms. Arellano reported that she had not been taking her medications consistently and that her depression and anxiety had been "worse lately." (AR 112.) She also told Dr. Tucker that she wanted to report the abuse she experienced as a child because she was concerned that it may be continuing with the alleged abusers' grandchildren. (Id.) At Ms. Arellano's request, Dr. Tucker contacted CYFD to report the abuse Ms. Arellano experienced and the possibility that there were

children who may still be in danger. (AR 113.) Dr. Tucker restarted Ms. Arellano's medications at that time. (AR 112.)

Considering the reasons the ALJ gave for discounting Dr. Tucker's opinion regarding Ms. Arellano's mental functional limitations, the Court concludes that there is a reasonable probability that the additional evidence from Dr. Tucker predating the ALJ's decision would change the outcome of the decision. First, Dr. Tucker's records establish that she treated Ms. Arellano with some frequency, on an ongoing basis, and more than the "total of three occasions" the ALJ believed. To the extent the ALJ discounted Dr. Tucker's opinion based on his impression that Dr. Tucker's relationship with Ms. Arellano was insufficient to be entitled to greater weight, Dr. Tucker's records undermine that reason. Second, Dr. Tucker's records reveal that she was well aware of Ms. Arellano's history of alcohol and substance abuse when she opined that neither contributed to Ms. Arellano's limitations that Dr. Tucker assessed. This undermines the ALJ's reason for discounting Dr. Tucker's opinion based on his belief that Dr. Tucker "fail[ed] to disclose [Ms. Arellano's] extensive history of illegal drug use and alcohol use[.]" (AR 037.) Finally, Dr. Tucker's records render the ALJ's finding that Ms. Arellano "has not sought treatment since January 2017" wholly unsupported. (AR 037.) While the administrative record does not contain any treatment records from January 20 to August 7, 2017, Dr. Tucker's records establish that Ms. Arellano was consistently and continuously seeking treatment for her mental health conditions as of August 2017, i.e., during the nearly six-month period immediately preceding the ALJ's decision. Because the ALJ repeatedly noted that he was discounting Ms. Arellano's statements concerning the intensity, persistence, and limiting effects of her symptoms based on what appeared to be a lapse in treatment in the year preceding his decision, there is a reasonable probability that evidence establishing that Ms. Arellano continued to seek mental health treatment and continued

to be treated with medications to address worsening anxiety and depression would change the ALJ's assessment of Ms. Arellano's RFC and, thus, his decision.

## 2. There is a reasonable probability that the additional evidence from Injury Relief Center would change Ms. Arellano's exertional RFC and, therefore, the decision.

The records from Injury Relief Clinic predating the ALJ's decision included treatment records from Ms. Arellano's initial visit with Ruben Franco, PA-C, on December 6, 2017 and her follow-up visit on January 9, 2018. (AR 082-96.) PA-C Franco noted at Ms. Arellano's initial visit that she had been referred to the clinic "by her one-time primary care provider for her ongoing chronic pain" that stemmed from a 2007 accident in which she was hit by a motorcycle. (AR 085.) Ms. Arellano reported that she had experienced pain ever since the accident but that the pain had "gradually gotten worse since that time" and was "significantly elevated" in the preceding 3-4 years. (Id.) PA-C Franco gave Ms. Arellano a urine drug screen, ordered imaging of Ms. Arellano's back and knees, and prescribed two non-opiate medications, informing Ms. Arellano that he would not consider prescribing any opiates until he had a definitive diagnosis. (AR 086-87.) In the notes from Ms. Arellano's follow-up visit, PA-C Franco indicated that Ms. Arellano's drug screen was consistent with the prescribed medications she was taking and contained "[n]o abnormal findings." (AR 082.) After reviewing Ms. Arellano's imaging, PA-C Franco recorded the following impression: "42-year-old female with ongoing chronic low back pain with multilevel degenerative disc disease most notable at L4-5 and L5-S1 along with facet arthropathy at L4-5 and L5-S1 with annular tears and disc protrusion, along with ongoing bilateral knee pain status post multiple surgical procedures and previous diagnosis of trigeminal neuralgia." (AR 083.) Based on her drug screen containing no abnormal findings, he prescribed her hydrocodone to take as needed. (AR 084.) He also discussed the possibility of various injections in her back and knees and noted that she would continue to be monitored for a possible referral to a specialist to address her trigeminal

neuralgia. (AR 083-84.) Upon examination in both December 2016 and January 2017, PA-C Franco found that Ms. Arellano had limited cervical spine flexion and positive facet loading in the cervical and lumbar spine, i.e., reduced ranges of motion. (AR 083, 086.)

The reasons the ALJ gave for assessing Ms. Arellano as having a less limited physical RFC than she claimed her symptoms supported were: (1) her range of motion "has been normal[,]" (2) she "has an extensive history of polysubstance abuse[,]" (3) she "has not sought treatment since January 2017[,]" and (4) her daily living activities of preparing meals, driving, shopping in stores, watching television, socializing with her family, and doing laundry, dishes, and light housekeeping were "inconsistent with complaints of disabling pain." (AR 036.) As with Dr. Tucker's records, the additional evidence from Injury Relief Center renders the ALJ's finding that Ms. Arellano had not sought treatment in the prior year wholly unsupported. It also directly contradicts the ALJ's finding regarding Ms. Arellano's range of motion. Notably, the only evidence the ALJ cited to support his finding that Ms. Arellano's range of motion "has been normal" was a medical record prepared for the purpose of clearing Ms. Arellano for incarceration following a DWI arrest in *December 2016*, i.e., more than one year before the ALJ issued his decision. That record documented Ms. Arellano's overall musculoskeletal exam result as "[n]ormal range of motion" with no signs of swelling. (AR 828.) No specific assessments (e.g., cervical spine and lumbar spine) are documented. By contrast, PA-C Franco examined Ms. Arellano for the purpose of providing treatment for her chronic pain. He conducted an in-depth physical examination assessing different ranges of motions in Ms. Arellano's cervical spine and lumbar spine and found limitations in multiple ranges of motion. (AR 083, 086.) Finally, to the extent the ALJ discounted Ms. Arellano's complaints based on what he described as her "extensive history of polysubstance abuse[,]" the additional evidence from Injury Relief Center undermines that basis by reporting that

Ms. Arellano's urinalysis contained "[n]o abnormal findings" as of December 2017. (AR 082.) Indeed, PA-C Franco agreed to put Ms. Arellano back on hydrocodone based on her clean drug test. (AR 084, 087.) Based on the foregoing, the Court concludes that there is a reasonable probability that the additional evidence from Injury Relief Center that predates the ALJ's decision would change the outcome because it contravenes the majority of the reasons the ALJ provided to support a less restrictive physical RFC for Ms. Arellano.

**C.    The Appeals Council erred by refusing to consider certain additional evidence Ms. Arellano submitted that postdates the ALJ's decision.**

The additional evidence Ms. Arellano submitted that postdates the ALJ's decision comprised:

1. Dr. Tucker's medical treatment records dated 01/30/2018 to 04/04/2018 (AR 058-81);
2. Medical treatment records from Injury Relief Center dated 02/08/2018 to 04/03/2018 (AR 045-57);
3. Dr. Tucker's MRFC Questionnaire dated 03/21/2018 (AR 020-25);
4. Dr. Tucker's to-whom-it-may-concern letter dated 03/28/2018 (AR 019); and
5. A medical treatment record from psychologist Linda Hill, Psy.D, dated 04/06/2018 (AR 008-13).

The Appeals Council refused to consider any of the foregoing evidence because it found that the evidence "does not relate to the period at issue" and "[t]herefore, it does not affect the decision about whether [Ms. Arellano] was disabled beginning on or before January 24, 2018." (AR 002.)

On appeal, Ms. Arellano argues that the Appeals Council's decision reflects a misunderstanding regarding the requirement that the additional evidence be "relate[d] to" the period of disability at issue in the ALJ's decision. (Doc. 23 at 20-21.) Citing *Padilla v. Colvin*, 525 F. App'x 710, 712-13 (10th Cir. 2013), she contends, "the Appeals Council did not indicate that it understood that the evidence submitted need not pre-date the ALJ's decision in order to qualify as chronologically pertinent." (Id.) The Commissioner counters that *Padilla* is distinguishable and

that the additional, postdated evidence does not qualify for consideration under 20 C.F.R. § 404.970 not only because it is not chronologically pertinent but also because it is cumulative, i.e., not new, and because Ms. Arellano has not demonstrated that there is a reasonable probability that the additional, postdated evidence would have changed the outcome of the ALJ's decision. (Doc. 29 at 20-21.) Because the parties disagree as to its applicability, the Court begins with a discussion of *Padilla*.

### 1. The Commissioner misunderstands *Padilla*.

*Padilla* involved a challenge to the Appeals Council's refusal to consider additional evidence comprising a psychological evaluation and an audiological evaluation that took place after the ALJ issued a final decision. *Padilla*, 525 F. App'x at 711-12. In that case, the claimant claimed and presented evidence indicating that he suffered from severe mental as well as physical impairments, but the ALJ found that the claimant suffered only from two physical impairments—right knee osteoarthritis and obesity—and therefore assessed an RFC reflecting only exertional, but not nonexertional, limitations. *Id.* at 712-13. The Appeals Council refused to consider the post-decision evaluations, not based on materiality but rather because it concluded that the evidence was "chronologically irrelevant and thus 'did not affect' its decision" about whether the claimant was disabled. *Id.* at 711. The Tenth Circuit, in an unpublished decision, reversed. *Id.* at 710, 713. The court first concluded that the additional evidence was "new" because the record before the ALJ did not contain either a psychological or audiological evaluation, meaning that neither piece of evidence was cumulative of other evidence in the record. *Id.* at 712. It next agreed with the claimant that "the ALJ's RFC could reasonably be found to be unsupported by substantial evidence because it failed to take into account the nonexertional limitations revealed by the additional evidence." *Id.* at 712-13. It thus concluded that the additional evidence was "material" because it

was "indicative of nonexertional limitations that could reasonably have changed the outcome." *Id.* at 713. Finally, it agreed with the claimant that the additional evidence was "temporally relevant[,]" noting that (1) the psychological report "corroborates an anxiety diagnosis" made by the claimant's treating doctor prior to the hearing and testified to by the claimant at the hearing, (2) the psychological report's intellectual functioning evaluation "relates to and augments [the claimant's treating doctor's] earlier report that [the claimant] could not read or write[,]" and (3) the audiological report related to the claimant's testimony at the hearing—i.e., the time period before the ALJ's decision—regarding his hearing loss. *Id.* Having determined that the additional evidence was new, material, and related to the time period before the ALJ's decision, the court concluded that the Appeals Council should have considered the evidence in determining whether the ALJ's decision was supported by substantial evidence and, therefore, reversed and remanded. *Id.*

The Commissioner contends that *Padilla* is distinguishable. (Doc. 29 at 20.) Describing the additional evidence in this case as "reflect[ing] that [Ms. Arellano] continued to be seen for joint pain (particularly in her low back and knees) and for PTSD[,]" the Commissioner asserts without further explanation and without discussing the records individually that all of the additional evidence in this case "was cumulative." (Id.) The Commissioner also attempts to distinguish *Padilla* by pointing to the fact that in *Padilla*, the additional evidence related to alleged conditions that the ALJ rejected, whereas here, the additional evidence related only to impairments alleged by Ms. Arellano that the ALJ "accepted." (Id.) For the following reasons, the Court finds the Commissioner's attempts to distinguish *Padilla* unavailing and concludes that certain records submitted by Ms. Arellano should not have been rejected from consideration by the Appeals Council, necessitating remand.

**2.    Certain of the postdated records submitted to the Appeals Council qualify for consideration.**

To qualify for consideration by the Appeals Council, the additional evidence must be new, material, and related to the period on or before the date of the hearing decision, and there must be a reasonable probability that the additional evidence would change the outcome of the decision. 20 C.F.R. § 404.970(a)(55). The additional evidence supplied by Dr. Hill does not meet the criteria because it is not material. Dr. Hill's lone treatment record from April 6, 2018 documents her initial visit with Ms. Arellano and contains primarily historical information and Ms. Arellano's subjective reports regarding her then-present symptoms. (AR 008-13.) It contains neither an opinion by Dr. Hill regarding Ms. Arellano's work-related abilities nor any other information that directly relates to or would bear upon the ALJ's determination of Ms. Arellano's RFC or any other issue the ALJ adjudicated as of January 24, 2018.[9] Other than describing the contents of Dr. Hill's record, Ms. Arellano offers no explanation of the relevance, i.e., materiality, of this additional evidence. (See Doc. 23 at 22-24.) Dr. Tucker's March 2018 to-whom-it-may-concern letter, also fails to satisfy the required criteria because although it references treatment history that pre-dates the ALJ's decision, the opinions expressed therein regarding her inability to sustain gainful employment or any type of full-time work are temporally limited to "the current time," i.e. March 2018. (AR 019.) Thus, the Appeals Council did not err in failing to consider Dr. Hill's records and Dr. Tucker's March 2018 letter. For the reasons that follow, however, the Court finds that the other records submitted as additional evidence satisfy the criteria for consideration and the Appeals Council erred in failing to consider them.

---

[9] The fact that Dr. Hill's treatment record indicates that Ms. Arellano reported feelings of worthlessness and wishing she were dead in April 2018 is not relevant to the ALJ's January 2018 decision because Ms. Arellano's mental status evaluation in April 2018 specifically asked Ms. Arellano to report how she had been feeling in the previous two weeks. (AR 011.)

a.      **The additional evidence is "new"**

"Additional evidence is new if it is not part of the claim(s) file as of the date of the hearing decision." Hearings, Appeals and Litigation Law Manual ("HALLEX") I-3-3-6(B)(2), https://www.ssa.gov/OP_Home/hallex/I-03/I-3-3-6.html (last updated May 1, 2017). Moreover, to be considered new, evidence must not be merely duplicative or cumulative of other evidence in the record. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003). By virtue of when it was created, none of the evidence Ms. Arellano submitted to the Appeals Council that postdates the ALJ's decision was part of her file before the date of hearing decision and therefore meets the first criterion for qualifying as "new." As noted above, however, the Commissioner contends that the evidence postdating the ALJ's decision does not qualify as "new" because it was "cumulative." (Doc. 29 at 20.) The Court disagrees.

The treatment records from Dr. Tucker and Injury Relief Clinic document Ms. Arellano's ongoing treatment and indicate the nature of Ms. Arellano's medical conditions and her providers' treatment and assessment of the severity thereof.  Dr. Tucker's March MRFC Questionnaire, completed based on "biweekly, sometimes weekly, to monthly"[10] treatment contact since August 9, 2017 differs significantly from her August 22, 2017 MRFC Questionnaire completed after seeing Ms. Arellano only three times in terms of her assessment of the severity of Ms. Arellano's functional limitations.  (Cf. AR 19-24 with AR 842-846.)  Thus, none of the foregoing postdated additional evidence was merely cumulative of evidence already in the record, and it therefore qualifies as new.

b.      **The additional evidence is "material"**

---

[10] (AR 20.)

"Additional evidence is material if it is relevant, i.e., involves or is directly related to issues adjudicated by the ALJ." HALLEX I-3-3-6.B.2.[11] Additional evidence that, if otherwise qualified under 20 C.F.R. § 404.970 and adopted upon consideration, would result in a more restrictive RFC and render the ALJ's determination of the claimant's RFC unsupported by substantial evidence is material. *See Padilla*, 525 F. App'x at 712-13. Additional evidence is not material if it has no bearing on the question of the claimant's alleged disability, i.e., if it does not relate to the claimant's work-related abilities and functional limitations, and does not relate to a condition that the claimant alleged to be disabling before the ALJ. *See Chambers*, 389 F.3d at 1144 (holding that postdated additional evidence "containing the first suggestion of a possible condition of unspecified duration and as yet unsubstantiated clinical presence" and that failed to address the condition's "vocationally relevant impact" provides "a patently inadequate basis for a disability claim" and is not material).

Here, one of the central issues adjudicated by the ALJ was a determination of Ms. Arellano's RFC. The ALJ's RFC included both exertional and nonexertional limitations based on what the medical evidence of record revealed about Ms. Arellano's various physical and mental conditions and was not as restrictive as Ms. Arellano contended it should be in light of her back, knee, and jaw pain and her PTSD and depression. The Injury Relief Clinic records indicate that

---

[11] The Court recognizes that the prevailing articulation of whether additional evidence is material under the prior version of 20 C.F.R. § 404.970 provides that "[e]vidence is material to the determination of disability if there is a reasonable possibility that it would have changed the outcome." *Threet*, 353 F.3d at 1191 (alteration and quotation marks omitted). However, in light of the 2017 amendment of 20 C.F.R. § 404.970 and its inclusion of a "reasonable probability" requirement in addition to the "new, material, and relate[d] to" requirements for qualifying additional evidence, the Court relies on the SSA's explanation of how it interprets the term "material" under the current version of the regulation to guide its analysis herein. *See W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 985 (9th Cir. 2012) (explaining that "[w]hen called upon to interpret a federal statute or the regulations implementing it, [courts] apply traditional rules of construction and, where required, administrative deference" (quotation marks omitted)); *see also Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (explaining that "the canon against surplusage indicates that we generally must give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning" (quotation marks omitted)).

Ms. Arellano had (1) limited ranges of motion in her cervical and lumbar spines, contradicting the ALJ's finding that Ms. Arellano's range of motion was "normal" and calling into question the less restrictive exertional limitations he assessed based on that finding, and (2) increased pain with prolonged standing and walking, calling into question the ALJ's RFC finding that she is "capable of standing and/or walking for about six hours in an eight-hour workday[.]" (AR 033.) Dr. Tucker's March 2018 MRFC Questionnaire assessed Ms. Arellano as having "[n]o useful ability to function" in most of the areas of work-related functionality assessed. (AR 022-23.) And Dr. Tucker's treatment notes from January through April 2018, a period during which Dr. Tucker treated Ms. Arellano biweekly, provide further documentation of Ms. Arellano's limitations resulting from her PTSD and depression. (AR 058-81.) Individually, but even more so collectively, the additional evidence from Dr. Tucker calls into question whether the ALJ's RFC that assessed only mild nonexertional limitations and his determination that Ms. Arellano is not disabled are supported by substantial evidence. Because the foregoing additional evidence directly relates to issues adjudicated by the ALJ—to wit, Ms. Arellano's exertional and nonexertional limitations as expressed in the ALJ's RFC—it is material.

c.      **The additional evidence "relates to" the period on or before January 24, 2018**

"Additional evidence relates to the period on or before the date of the hearing decision if the evidence is dated on or before the date of the hearing decision, *or the evidence post-dates the hearing decision but is reasonably related to the time period adjudicated in the hearing decision*." HALLEX I-3-3-6(B)(2) (emphasis added). "For example, a statement may relate to the period on or before the date of the hearing decision when it postdates the decision but makes a direct reference to the time period adjudicated in the hearing decision." *Id.* Evidence postdating an ALJ's decision that corroborates an existing diagnosis and/or evidence that was before and considered

by the ALJ also "relates to" the relevant period. *See Padilla*, 525 F. App'x at 711, 713 (holding that the Appeals Council should have considered medical evaluations that were completed after the issuance of the ALJ's decision because they corroborated a diagnosis reported by the claimant's doctor prior to the administrative hearing and related to an impairment that the claimant testified about at the hearing). The question is really whether the additional evidence was pertinent to and sheds light on the issues that were before the ALJ. *See id.*

The injury relief center records related to the period on or before the hearing decision. As noted above, Ms. Arellano first received treatment at Injury Relief Center in December 2017, i.e., during the adjudication period. (AR 085.) While that fact is not dispositive of whether evidence postdating the ALJ's decision relates to the adjudicated period, it is important in this case because the reason she established care at Injury Relief Center was because she was "sent by her one-time primary care provider for her *ongoing* chronic pain." (AR 085 (emphasis added).) While not a direct reference to the adjudication period, this description of why Ms. Arellano began to be seen at Injury Relief Center tends to establish a connection to issues adjudicated by the ALJ. Each of the Injury Relief Center records postdating the ALJ's decision makes clear that Ms. Arellano was receiving ongoing, follow-up treatment related to the chronic pain she suffers from as a result of the 2007 incident when she was run over by her then-husband while he was on a motorcycle, i.e., the same reason she began seeing Dr. Delgado in January 2013. (AR 045, 047, 049, 358.) The physical complaints for which she was receiving treatment at Injury Relief Center are the exact same as those for which she had been treated by Dr. Delgado: low back and knee pain, muscle spasms, and facial pain. (AR 045, 049-50, 363, 797, 808.)

Notably, Ms. Arellano had been receiving treatment for these same conditions for more than six years as of the date of the ALJ's decision, including with Injury Relief Center for the two

months immediately preceding the ALJ's decision. The postdated records from Injury Relief Center that the Appeals Council refused to consider all fall within less than three months after the ALJ's decision. The first record is from a "routine follow-up appointment" that occurred just two weeks after the ALJ issued his decision. (AR 049.) The next record is dated exactly one month later and documents another "routine follow-up appointment." (AR 047.) The last record is from Ms. Arellano's appointment one month after that at which Dr. Thomas Whalen, MD, conducted a physical examination and recorded impressions of right facial pain with possible trigeminal neuralgia, low back pain, and bilateral knee pain, i.e., all conditions that were before and considered by the ALJ. Because they corroborate long-standing diagnoses and evidence of conditions that were before the ALJ, the Court concludes that the additional evidence from Injury Relief Center relates to the adjudicated period.

Dr. Tucker's treatment records and March 2018 MRFC Questionnaire also relate to the period on or before the hearing decision. Dr. Tucker's treatment records postdating the ALJ's decision relate to and augment the opinions contained in her August 2017 MRFC Questionnaire regarding Ms. Arellano's functional limitations. Dr. Tucker's January 30, 2018 treatment record postdates the ALJ's decision by less than one week. That record provides that Ms. Arellano was "returning for follow up for PTSD[,]" i.e., the same condition for which Dr. Tucker had been treating Ms. Arellano since August 2017. (AR 058, 842.) Dr. Tucker noted that she "will call CYFD *again*[,]" i.e., a reference to her earlier call to CYFD to convey Ms. Arellano's report of childhood sexual abuse during her treatment of Ms. Arellano in the period *before* the ALJ's decision. (AR 058 (emphasis added).) It further provides that Ms. Arellano reported that her depression "has gotten worse" and that she "[h]ad not been taking [her medications] consistently before" but was starting to again. (AR 058.) By their very nature, these reports relate to the time

period before the ALJ's decision. All of Dr. Tucker's treatment records from the period postdating the ALJ's decision contain similar references to the ongoing nature of the treatment Ms. Arellano was receiving from Dr. Tucker. (AR 061-69.) As such, they all relate to the relevant period and should have been considered by the Appeals Council in determining whether the ALJ's decision was supported by substantial evidence. *See Padilla*, 525 F. App'x at 713.

Dr. Tucker's March 21, 2018 MRFC Questionnaire—while completed two months after the ALJ issued his decision—also relates to the period for which the ALJ determined whether Ms. Arellano was disabled. Dr. Tucker noted on the Questionnaire that she had been treating Ms. Arellano "biweekly, sometimes weekly, to monthly since 8/9/17[,]" i.e., during the period prior to and encompassed by the ALJ's decision. (AR 020.) As in her August 2017 MRFC Questionnaire, Dr. Tucker indicated that she was treating Ms. Arellano for nightmares, flashbacks, depressed mood, panic attacks, crying spells, and poor sleep, i.e., the same conditions and symptoms stemming from the childhood sexual abuse she suffered that Dr. Tucker began treating her for in August 2017. (AR 020.) She also noted that Ms. Arellano's medications "have needed titration [and] multiple trials[,]" i.e., adjustment over a period of time inclusive of the period adjudicated by the ALJ. (AR 020.) Dr. Tucker's March 2018 assessment of Ms. Arellano's mental functional limitations "relates to" the applicable period under 20 C.F.C. § 404.970 because it is connected to and substantiates her earlier assessment regarding Ms. Arellano's limitations that was before, and rejected by, the ALJ.

**d.      There is a reasonable probability that the additional evidence the Appeals Council refused to consider would change the outcome of the decision.**

It is not enough that the additional evidence is new, material, and relates to the period on or before the ALJ's decision. To qualify for consideration by the Appeals Council, there must also be a reasonable probability that it would change the outcome of the decision. 20 C.F.R.

§ 404.970(a)(5). For substantially the same reasons the Court concluded in Section II.B *supra* that there is a reasonable probability that the additional evidence *predating* the ALJ's decision would change the outcome of the decision, the Court concludes that there is a reasonable probability that the additional evidence *postdating* the ALJ's decision that is new, material, and relates to the adjudication period would change the outcome of the decision.

Regarding Ms. Arellano's physical RFC and exertional limitations, the ALJ accorded "significant weight" to the non-treating state agency reviewing physicians' opinions from August and October 2016 that Ms. Arellano was limited to a less-than-light physical RFC; he relied on a single medical record created for the purpose of clearing Ms. Arellano for incarceration that suggested she had a "normal range of motion" at the time of that examination; and he discounted Ms. Arellano's complaints of disabling pain at least in part based on his finding that she "has an extensive history of polysubstance abuse" and his belief that she "has not sought treatment for any impairment since January 2017." (AR 036.) The records from Injury Relief Center indicate that Ms. Arellano indeed had been seeking treatment for chronic pain, was assessed has having range-of-motion limitations, and had negative drug screens, allowing her continued access to narcotic pain medications. (AR 045-50.) Thus, the Court concludes that there is a reasonable probability that the ALJ would have weighed the evidence differently in assessing Ms. Arellano's exertional limitations if the additional evidence from Injury Relief Center had been part of the record.

Regarding Ms. Arellano's mental RFC and nonexertional limitations, the ALJ effectively rejected Dr. Tucker's opinion as to Ms. Arellano's functional limitations by assigning it "little weight." (AR 037.) At the time of the ALJ's decision, the only evidence before the ALJ from Dr. Tucker was her August 2017 MRFC Questionnaire. Given the ongoing treatment relationship and nature of the opinions evinced by the additional evidence from Dr. Tucker discussed above, the

Court concludes that there is a reasonable probability that the ALJ would have weighed Dr. Tucker's opinion differently and assessed a more restrictive RFC if Dr. Tucker's treatment records, and March 2018 MRFC Questionnaire had been part of the record.

In short, the ALJ's RFC reflected his finding that the "evidence as a whole" supported less restrictive exertional restrictions and nonexertional limitations than Ms. Arellano contended should be assessed. (AR 033-37.) The additional evidence postdating the ALJ's decision materially changes the picture of the "evidence as a whole" with respect to Ms. Arellano's physical and mental limitations. For all the foregoing reasons, the Court concludes that with the exception of Dr. Hill's treatment record and Dr. Tucker's letter, the Appeals Council erred by refusing to consider the additional evidence postdating the ALJ's decision. As such, remand is required. *See Chambers*, 389 F.3d at 1142-43.

### D.      Remaining Issues

Ms. Arellano's other claims of error relate to (1) the ALJ's weighing of certain opinion evidence, and (2) the ALJ's ultimate determination that Ms. Arellano is not disabled at step five of the sequential evaluation process. (Doc. 23 at 5-20.) Because the Court concludes that remand is required as set forth above, the Court will not address these remaining claims of error. *See Chambers*, 389 F.3d at 1143 (explaining that it is for the Appeals Council to "determine in the first instance whether, following submission of additional, qualifying evidence, the ALJ's decision is contrary to the weight of the evidence currently of record" (quotation marks omitted)); *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand).

### III.      Conclusion

For the reasons stated above, Ms. Arellano's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 23) is GRANTED IN PART.

IT IS SO ORDERED.

KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent